Filed 8/5/26  In re K.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087792 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J305633 & J305634) |
| v. | OPINION |
| K.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michelle Lauron, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant K.H. (Mother) is the mother of two daughters, K.G. (born December 2024) and K.B. (born February 2014).  Mother appeals the juvenile court's January 2026 jurisdictional and dispositional order adjudicating both children as dependents of the court (Welf. & Inst. Code,[1] § 300, subd. (b)) and removing them from parental custody.[2]

Mother contends that there was insufficient evidence of a nexus between Mother's conflicts with her neighbors and harm or substantial risk of harm to the children to support the juvenile court's jurisdictional finding under subdivision (b) of section 300 and the order removing the children from Mother's custody (§ 361, subd. (c)(1)).  We find that substantial evidence supports the juvenile court's orders and affirm.

## FACTUAL AND PROCEDURAL HISTORY

On August 19, 2025, plaintiff and respondent San Bernardino County Children and Family Services (CFS) took protective custody of K.G. and K.B. after Mother was arrested for disturbing the peace and violation of her probation.  CFS filed petitions for each child pursuant to section 300 on August 21, 2025.  With respect to Mother, both petitions alleged that the children were at risk of abuse and neglect based on Mother's issues with managing her anger (§ 300, subd. (b)(1)) and that Mother was incapable of

---

[1]  All further statutory references are to the Welfare and Institutions Code unless specified otherwise.

[2]  K.B.'s father, L.B. (Father), is not a party to this appeal.  K.G.'s alleged father is deceased.

providing care and provisions for the children because of her incarceration (§ 300, subds. (b)(2) and (g)(3)).

## A. MOTHER'S CFS HISTORY PRIOR TO THIS CASE

According to the jurisdiction and disposition report, prior to the instant action Mother was the subject of multiple CFS investigations based on reports of her engaging in prostitution and hitting K.B., which were deemed "inconclusive." At least one of the investigations, where K.B. was reported to have visible bruising on her face, was explicitly deemed inconclusive because CFS was unable to locate Mother. The one CFS investigation that was found to be "substantiated" was a neglect allegation in September 2021 when K.B. was found in the street barefoot and reported that she had no way of contacting Mother.

In June 2025, CFS received a referral regarding K.B., who was at the police station claiming that she was homeless and living on the street. She did not have any shoes, her clothing was very dirty, and she claimed that her parents died in a car accident. Mother reported K.B. as a runaway, and K.B. was returned to Mother. CFS made multiple attempts via letters, calls, and text messages to schedule appointments with Mother to speak with her, with no success.

When interviewed by CFS about the incident later, K.B. claimed that she did not have shoes on when she encountered law enforcement because she was in a hurry to leave. She said that she ran away from home "because the neighbors make her feel tired and stressed out." She reported that the neighbors record the family randomly, a "perverted" neighbor took pictures of Mother, there were arguments between Mother and

3

the neighbors, and law enforcement was constantly being called to the home. She stated that Mother wants her to be present during these incidents with the neighbors because the neighbors would make up lies about the family. When questioned again later about running away from home, K.B. said she did not want to go back home because the neighbors are "weirdos." She stated that Mother was mad at her for running away but they talked about it and "the next day we were better." The CFS report notes that K.B. "made long pauses when answering these questions and appeared guarded and fidgety."

In July 2025, CFS received another referral regarding K.B., who was seen vandalizing people's homes and taking people's clothing out of the dryers in the laundry room. It was reported to CFS that Mother would leave three to four times per week at night and not return home until the morning, that Mother would get into verbal arguments with her neighbors with K.B. present, and that she threatened another tenant with a knife.

In CFS interviews with K.B. after she was taken into protective custody in August 2025, she confirmed that she had been left home alone to care for her infant sister. K.B. first claimed that it was only for about an hour. She later stated that she stays home alone all the time when Mother "needs to do business," that she babysits K.G. and "take[s] really good care of [her] baby sister." K.B. also disclosed that in 2023, before K.G. was born, she would stay home asleep at night while Mother went to work. The children's caregiver noted concerns about K.B. feeling responsible to change diapers and make bottles for K.G.

4

B.     MOTHER'S INCIDENTS WITH NEIGHBORS AND OTHERS PRIOR TO THIS CASE

During K.B.'s interviews with CFS after being taken into protective custody, she stated that she and Mother had been residing in the apartment complex for six years and "have been fighting the whole time, every neighbor tries to be mean to us." K.B. described multiple conflicts that had occurred between Mother and their neighbors in the apartment complex. What follows is a summary of Mother's troubling engagements with neighbors and other third parties, much of the information for which came directly from Mother during her interviews with CFS or her testimony at the January 2026 jurisdiction and disposition hearing.

Mother claimed that in October 2022, the gardener at the apartment complex blew dirt at her using his leaf blower, and he "was poking me with his finger, and then he karate kicked me in my leg, I fought back because I was defending myself." Although Mother testified that K.B. was not present, K.B. was aware of this incident and described to CFS that the gardener had been blowing leaves and dirt at Mother, that the gardener pushed Mother, and that Mother and the gardener "were hitting each other."

In November 2024, according to Mother, one of the neighbors was (for unexplained reasons) angry at Mother, so they sent their children to lean against Mother's car. Mother pushed the alarm button on her vehicle. The police came and the neighbor claimed Mother had brandished a gun at them, which Mother denied, although she did admit to owning a gun. According to Mother, the charges were dropped due to lack of evidence.

In May 2025, Mother noticed a man on her security camera who was looking at her vehicle. She went to inspect her vehicle and discovered a long scratch on the driver's side, so she reported to the apartment property manager that the man had hit her vehicle with his U-Haul truck. The police then arrived and arrested her, accusing Mother of brandishing a knife at the man who allegedly hit her vehicle and threatening to kill him. Mother denied brandishing a knife, although the police found a knife in her sports bra. Mother claimed that she pleaded no contest to the charges so that she could "get out and fight [her] case," that she was suing the property manager "for lying and stating she was a witness," and that she had contacted the California Civil Rights Department. Mother testified in January 2026 that she felt this situation was a "four against one, taking their word, saying I was violent," although she admitted she had never met the U-Haul driver previously.

In June 2025, Mother sought a restraining order against her downstairs neighbor, R.M., based on Mother's claims that R.M. and her boyfriend were harassing her whenever she was outside. Mother admitted that the restraining order request was denied due to insufficient evidence. Mother's sister served R.M. with the restraining order paperwork. On the day R.M. was served, Mother was attempting to enter her apartment with both children when R.M. came up the staircase and walked towards Mother with her fists clenched. Mother felt threatened so she sprayed R.M. in the face with mace. Mother testified that both children, including K.B., who was in a car seat, were approximately four feet away from her when she sprayed the mace.

### C.     MOTHER'S ARRESTS IN AUGUST 2025

On August 19, 2025, the date on which CFS took the children into protective custody, Mother called the police on the apartment manager and the neighbors living below her alleging that they stole her security cameras. Mother claimed that the neighbors called the police on her daily for noise complaints and that the San Bernadino Police Department was harassing her. K.B. stated that she was home alone when the property manager took down Mother's cameras, so she contacted Mother to let her know about it, and that when the police arrested Mother she did not know why but "the neighbors are always messing with my mom." Mother was charged with disturbing by loud/unreasonable noise (Pen. Code § 415, subd. (2)), probation violation (Pen. Code § 1203.2, subd. (a)(4)), and assault with a deadly weapon likely to produce great bodily injury (Pen. Code § 245, subd. (a)(4)).

The August 19, 2025, police report reflects that police had previously been called regarding Mother's apartment more than five times for noise complaints dating back to May 31, 2025. The report reflects observations by the police that there was an open case with Code Enforcement about noise complaints, that Mother had refused requests from the property manager to turn off the alarm noise on her security cameras, and that the alarm could be heard from about 50 feet away and "mimicked the sound of a siren." Mother was in jail for three days following this incident.

On August 23, 2025, Mother was arrested again. Mother stated that based on advice from her attorney, she refused to answer the door when police officers came to her residence, resulting in the police kicking down her door to arrest her. Mother was

7

charged with disturbing by loud/unreasonable noise (Pen. Code § 415, subd. (2)), probation violation (Pen. Code § 1203.2, subd. (a)(4)), assault with a deadly weapon likely to produce great bodily injury (Pen. Code § 245, subd. (a)(4)), and obstruction of a peace officer (Pen. Code § 148, subd. (a)(1)).

Mother later provided a minute order reflecting that at least one of her criminal cases had been dismissed, although the copy in the record is unclear as to which case was dismissed. Mother testified that both "unreasonable noise" charges had been dismissed.

On August 26, 2025, at the continued detention hearing, the juvenile court noted that there had been a conference off the record and that following minor's counsel discussion with K.G., she would remain with the caregiver. Minor's counsel confirmed that K.B. "currently supports decompressing or de-stressing from the situation and that she perceives Mom's home unsafe due to ongoing issues with the neighbor in the other residence." The juvenile court originally ordered that K.B. would remain with the caregiver and K.G. would be returned to Mother's custody. It was then determined that Mother was in jail at that time and could not take custody of K.G., so both children continued to be in CFS's custody. Mother was granted 8 hours of unsupervised visitation per week with both children. Mother filed an appeal from the August 26, 2025 hearing (case No. E086810); however, it was dismissed as no dispositional order had yet been made.

D.      <u>MOTHER'S CONDUCT DURING VISITATION</u>

Prior to Mother's first visit with the children following their detention, Mother sent text messages (it is unclear to whom) stating that if there was anything wrong with

8

the children when she saw them, she would not give them back to the caregiver. After a CFS social worker spoke with Mother, Mother stated she would bring the children back but would call the police if she had any concerns.

Mother was scheduled to have her first unsupervised visit with the children in September 2025 at a McDonald's. The children's caretaker left the McDonald's after 30 minutes when Mother did not show up. Mother sent multiple text messages to the CFS social worker on her case wherein she claimed that another social worker gave her the wrong address, claimed she filed a police report, threatened to sue both social workers, demanded that the caretaker bring the children back to McDonald's, and stated, "I'm not leaving till I see my children" and "I want them removed from this foster lady as soon as tomorrow comes as well."

A week later, after Mother had her first unsupervised visit with the children, K.B. reportedly told her caregiver that her visits with Father should be at the CFS office because Father could "kidnap her, and the Court said the visits need to be at the office, so they are breaking the law." K.B. also laid out several rules for the caregiver and said it was her (K.B.'s) responsibility to follow the rules and take care of her little sister. K.B.'s caregiver reported that according to K.B., Mother told K.B. that "she is getting fat and that her father will kidnap her and kill the baby," and that K.B. is responsible for her baby sister no matter what.

In September 2025, Father informed CFS during an interview that although his initial supervised visit with K.B. went well overall, he was concerned about a comment K.B. made about her sister going to jail. Father's adult daughter was in jail at that time,

9

and Father did not ever talk to K.B. about his other family, so he was concerned that Mother was coaching K.B. and involving her in adult matters.

Based on concerns that Mother may be coaching K.B., in September 2025 the court ordered Mother's visits to be supervised and reduced to twice per week for two hours per visit.

In October 2025, the children's caregiver reported that Mother approached her in the lobby of the visitation center and was confrontational about not being informed of K.B. having a doctor's appointment. Mother was holding K.G.'s diaper bag and would not provide it to the caregiver, and reportedly told the caregiver in front of K.B., "[i]f you do not do what I say about my children then they could die in your care." Mother denied saying this to the caregiver or holding on to the diaper bag, claimed it was the caregiver who was argumentative, and claimed that it was an emergency room visit, not a doctor's appointment, of which she should have been informed. The record does not contain any information as to whether K.B. was taken to a doctor's appointment or emergency room visit.

In November 2025, Mother had a verbal altercation with the supervised visitation monitor in the presence of the children. Mother was allowing K.G. to talk to her about her caregiver, and refused to change the topic of the discussion when the monitor asked her to do so. Mother reportedly told the monitor, "if my daughter wants to tell me what's going on where she's living, I'm going to listen and allow her to tell me." The monitor therefore terminated the visit and asked Mother repeatedly to leave, but Mother refused. While the children were still present, Mother made a phone call and told the monitor that

she wanted the monitor to hear what she was telling the social worker and her attorney. Even after the children left with their caregiver, Mother refused to leave the supervised visitation facility, and in front of the monitor left a message for somebody claiming that the monitor had called her a bitch, which the monitor immediately denied. Mother only left after the monitor told her that she would call the police. Mother's version of events was largely consistent with the monitor's report, except that she felt the monitor was the person who was being inappropriate.

E. JANUARY 2026 JURISDICTION AND DISPOSITION HEARING

On January 26, 2026, CFS filed an Additional Information to the Court form, which reported that Mother had been referred to individual therapy, parenting education, and anger management in September 2025. However, according to the report, when CFS inquired of Mother's progress regarding the services offered, she responded, "They are not Court ordered, I do not need to comply with any classes, there is no evidence against me, I know my rights and I do not need to do classes."

The juvenile court held a contested jurisdiction and disposition hearing on January 29, 2026. The court struck the allegations associated with Mother being in custody but otherwise found the allegations in the petitions to be true. The court declared both children to be dependents of the court and ordered their removal from both parents. The court also ordered Mother to undergo a psychological evaluation.

**DISCUSSION**

"In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted

11

or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

A.    JURISDICTIONAL FINDINGS

Section 300, subdivision (b)(1), provides in relevant part that a child is within the jurisdiction of the juvenile court where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of… [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child." The standard of proof for this finding is by a preponderance of the evidence. (§ 355, subd. (a).)

"The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165 [disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010-1012].)

Here, the record is replete with instances of Mother getting into angry confrontations with third parties. On certain occasions, Mother's confrontations with others escalated to violence, including Mother's run-in with the gardener where she states she "fought back," Mother's threatening the U-Haul driver with a knife, for which she was arrested and pled no contest, and Mother's use of mace in the presence of, and a short distance from, both children. Mother claims that only the mace incident took place

12

in front of the children, but K.B. was aware of Mother and the gardener "hitting each other."

Mother argues that there was no "causal link or sufficient nexus" established between her aggressive conduct and the risk of harm to the children. However, the juvenile court analogized Mother's conduct to domestic violence, and we agree that there is a meaningful similarity between Mother's conduct and domestic violence for the purposes of a jurisdictional finding. Irrespective of whether the violence in question was taking place between Mother and a person with whom she has a domestic relationship, versus any other third party like the neighbors, the children were exposed to risk of harm by her actions. "Exposure to domestic violence may support jurisdiction under subdivision (b)(1) of section 300…. Jurisdiction is appropriate since a minor can be 'put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg.' " (*In re L.O.* (2021) 67 Cal.App.5th 227, 238.) The court may invoke its jurisdiction pursuant to section 300, subdivision (b), "even if a child has emerged physically unscathed from an instance of domestic violence." (*L.O.*, at p. 239.)

Mother asserts that her conflicts were solely due to her neighbors' behavior, such that her moving to a new apartment alleviated all concerns.[3] It is true that in order for

---

[3] Mother also portrays her choice to move to a new apartment reflects protective action on her part. However, Mother's claim in this respect is somewhat diminished by the fact that she was in the process of being evicted from her prior apartment when she moved and planned to contest the eviction, suggesting it was not entirely a voluntary choice by Mother.

domestic violence to serve as the basis for the juvenile court's exercise of jurisdiction pursuant to section 300, subsection (b), there must be "evidence that the violence is ongoing or likely to continue." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, disapproved on another ground by *In re D.P.* (2023) 14 Cal.5th 266, 278.)  In this instance, Mother had angry confrontations with not just her neighbors but also the children's caretaker and the supervised visitation monitor, both of which incidents took place in front of the children.  Mother's aggressive conduct did not cease after moving to a new apartment or while in the midst of a pending CFS investigation, thus there is substantial evidence that the children remain at risk of harm.

Mother also flatly refused to participate in the services offered by CFS, which was a point of concern for the juvenile court and is additional evidence of the continued risk to the children.  While it is true, as Mother argues, that such services are entirely voluntary, Mother is wrong in claiming that a parent's refusal to engage in voluntary services may not be used against him or her.  Mother does not cite to any legal authority for this proposition but instead, in both her opening brief and reply brief, cites to the clerk's transcript.  One of the cases that Mother does cite in her brief, *In re E.E.* (2020) 49 Cal.App.5th 195, provides plainly:  "A parent's participation in services, whether before jurisdiction and disposition or after, is always voluntary….  [¶] … [¶]  That's not to say there are no consequences for failing to cooperate in the investigation or participate in services.  One consequence is that those failures 'can be used later as evidence in a review hearing or a hearing on a [section 300] petition.' " (*Id.* at p. 209.)

Mother's failure to express remorse or show any insight regarding her conduct is another indicator of a continued risk of harm. (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 240.) "[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision." (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) Mother's rejection of the services offered to her and insistence that there was "no evidence against [her]" and statement that "I do not need to do classes" reflects her denial that she has done anything wrong and shows a likelihood that she will repeat the behavior. As the juvenile court remarked, if Mother had participated in any of the services offered by CFS, "This could be a very different case."

Mother argues that her case is most similar to *In re J.N.* (2021) 62 Cal.App.5th 767 (*J.N.*). In *J.N.*, the father was incarcerated and the child, J.N., was in the mother's care. (*Id.* at pp. 771-772.) A juvenile dependency petition was filed after the mother's newborn child, the half sibling of J.N., tested positive for marijuana. (*Ibid.*) The Court of Appeal vacated the juvenile court's jurisdictional finding with respect to the father, holding that the sole evidentiary basis for the finding was the father's incarceration and criminal record with no actual nexus shown between his criminal history and any substantial current risk of harm to J.N. (*Id.* at 775.) The *J.N.* court noted there was nothing to suggest that the father's crimes involved children, that his crimes placed J.N. in harm's way, or that he exposed J.N. to his criminal activities. (*Id.* at pp. 775-776.)

We do not agree with Mother that *J.N.* is in any way applicable in this instance, and the same is true of the recent, similar case of *In re A.M.* (2025) 114 Cal.App.5th 627, 633-634 (reversal of juvenile court's removal of minor child from father based solely on

his criminal activity, which child was not present for or affected by). The juvenile court here did not assert its jurisdiction merely because Mother has a criminal record. It is apparent from the juvenile court's oral statement of its ruling that it considered not just Mother's troubling actions—some of which have led to criminal prosecutions but some of which have not—but specifically the risk of harm to the children as a result of those actions. As noted *ante*, the court specifically likened Mother's conduct to domestic violence and the harm that may befall children who are exposed to violence. Unlike in *J.N.*, both K.B. and K.G. have been exposed to Mother's aggressive conduct, including the incident where Mother used mace in close proximity to the children. The impact on K.B. was clear, as she stated through minor's counsel that she felt unsafe in Mother's home due to the conflicts with the neighbors.

Further, the juvenile court identified other reasons for its ruling beyond Mother's conduct. The court noted that although Mother's testimony did not address the issue, K.B. had reported being left alone to care for K.G. at nighttime, and "that alone puts both these children in great danger." The court also noted that K.B. was previously found alone and saying she was homeless, which, along with the prior CFS reports, suggested she was being left alone for periods of time and could wander the streets without Mother knowing where she was. Thus, Mother's confrontations with various third parties were not the sole basis for the juvenile court's proper assertion of its jurisdiction over K.B. and K.G.

We conclude there was substantial evidence to support the juvenile court's section 300, subdivision (b), jurisdictional finding against Mother.

## B. DISPOSITIONAL FINDINGS

Section 361, subdivision (c), provides that a child may be taken from the physical custody of her parents where the juvenile court finds clear and convincing evidence that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if returned home and "there are no reasonable means by which the minor's physical health can be protected without removing the minor" from her parent's physical custody.

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995-996.)

As discussed *ante*, there was substantial evidence that Mother had a pattern of becoming involved in aggressive altercations with third parties, sometimes in the presence of the children, and leaving the children without supervision. The risks presented by Mother's conduct were not alleviated by her moving to a new apartment as she continued to engage in aggressive confrontations with other third parties. We find

17

that there is substantial evidence adequate to meet the "highly probable" standard of review set forth in *O.B.* to support the juvenile court's removal order.

Mother likens her case to that of *In re M.V.* (2022) 78 Cal.App.5th 944. In *M.V.*, there were incidents of domestic violence between the father and the mother, with the mother being the primary aggressor, and the children were placed into protective custody. (*Id.* at pp. 948-951.) Both parents enrolled in domestic violence classes and were progressing well in the classes. (*Id.* at 952-953.) Of concern, however, was the father recanting his statements of the mother's abusive conduct. (*Id.* at p. 951, 961.) Despite the social worker testifying without qualification that she could not think of any safety risk of placing the children with the father, the juvenile court ordered removal of the children from both parents, stating "there is no hope for a safety plan because neither parent acknowledges that there are events and behaviors that need to be addressed and changed." (*Id.* at pp. 961-962.) Upon reversing the lower court's order, the *M.V.* court held that "[a]lthough troubling, the parents' 'lack of transparency' or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of the Children from either parent's custody." (*Id.* at p. 962.)

Mother is unlike the parents in *M.V.* She did not engage in any services offered by CFS, and there is no testimony from a CFS social worker professing a belief that the children would be safe if returned to Mother. (Cf. *In re M.V.*, *supra*, 78 Cal.App.5th at pp. 962-963.) Mother does not deny that most of the troubling incidents discussed herein actually took place, and in fact many of the details of the incidents came directly from her. Mother only denies any wrongdoing on her part. Moreover, unlike in *M.V.*,

18

Mother's denial of wrongdoing is not the sole reason for the juvenile court's removal order; there is other substantial evidence to support the order.

Mother further argues that the removal order was erroneous because there were other reasonable alternatives to removal such as protective orders, unannounced visits by CFS, or a detailed safety plan. However, as noted above, Mother did not engage with any of the services offered by CFS and in fact actively rejected them claiming she did not need them. Mother also has a history of avoiding CFS social workers when the children are in her custody. In the face of that conduct, there was substantial evidence to support the order of removal. In addition, the one unsupervised visit that Mother had with the children immediately led to K.B. making statements to her caregiver and Father suggestive of Mother coaching K.B. and involving her in adult matters. During one of Mother's supervised visits, she engaged in an aggressive verbal altercation with the monitor in front of the children. Mother's suggestion that the children should be returned to her custody with appropriate safeguards "ignores her inability to control her behavior even during supervised visits." (*In re H.E.* (2008) 169 Cal.App.4th 710, 724.)

Finally, we reject Mother's contention that the juvenile court's comment regarding a mental health evaluation being "helpful" was a legal error requiring reversal.[4] Mother

---

[4] After discussing several of the altercations between Mother and various third parties, the court commented: "We don't know the whole story. It was one person's word against the other. One person says there was a knife, one person says there wasn't a knife. But to really to look at all of these things in combination together really does look like it was a massive conspiracy against Mom and that leads to the paranoia, that leads to the concern that there may potentially be some mental health issues. [¶] Had there been a mental health evaluation or something maybe beforehand, that might have been something helpful."

19

again does not cite to any legal authority in support of this proposition but instead cites to the reporter's transcript. Regardless, while Mother is correct that, as set forth in *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 203, the court could not have ordered an evaluation prior to its finding of jurisdiction, the court here was not attempting to make such an order. The court's comment is neither an order nor a finding, so there is nothing to be reversed or vacated.

## DISPOSITION

The juvenile court's findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                    J.

We concur:


RAMIREZ _____
                        P. J.


CODRINGTON _____
                        J.

20